UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Continental Building Products Operating Company, LLC,

Plaintiff,

–v–

Lafarge North America, Inc. et al.,

Defendants.

17 Civ. 2599 (AJN)

MEMORANDUM
OPINION AND ORDER

ALISON J. NATHAN, District Judge:

In this diversity action, Plaintiff Continental Building Products Operating Co. ("Continental") seeks indemnification from Lafarge North America, Inc. ("Lafarge") for its costs associated with defending against an antitrust suit. Continental further seeks declaratory judgment that it is not obligated to indemnify Lafarge for any portion of Lafarge's costs defending itself in that same antitrust suit. Lafarge now moves to dismiss the complaint for failure to state a claim upon which relief can be granted. For the reasons explained below, the Court grants the motion to dismiss.

I. Background

A. 2012 Antitrust Actions Against Wallboard Industry ("Purchasers Cases")

In late 2012, a series of antitrust actions were commenced against the entire U.S. wallboard industry, alleging that the industry had engaged in price-fixing from 2011 to 2013. Amended Complaint ("AC"), Dkt. No. 24, ¶¶ 10-11; Asset Purchase Agreement ("APA"), Ex. A to AC, Dkt. No. 24-1, at 20; *see also* Direct Purchasers' Consolidated Amended Class Action Complaint ("Direct Purchasers Complaint"), Ex. B to AC, Dkt. No. 24-2; Indirect Purchasers'

1

First Amended Consolidated Class Action Complaint ("Indirect Purchasers Complaint"), Ex. C to AC, Dkt. No. 24-3. One of the defendants named in the actions was Lafarge. AC ¶ 14; Direct Purchasers Complaint at 1; Indirect Purchasers Complaint at 1. These lawsuits were brought by customers who bought wallboard directly from the wallboard manufacturers and contractors and consumers who purchased wallboard at retailers (together, the "Purchasers Cases"). AC ¶ 12. *See generally* Direct Purchasers Complaint; Indirect Purchasers Complaint. These cases were consolidated before Judge Baylson in the U.S. District Court for the Eastern District of Pennsylvania. AC ¶ 13.

### B. Asset Purchase Agreement Between Continental and Lafarge

On June 24, 2013, Continental[1] and Larfarge signed an Asset Purchase Agreement ("APA"), under which Continental purchased substantially all the assets and liabilities of Larfarge's gypsum wallboard business. AC ¶ 6. *See generally* APA. Included in the APA were two indemnity clauses. The first, entitled "Indemnification by the US Seller,"[2] states:

> From and after the Closing Date, the Purchaser . . . shall be indemnified and held harmless by the US Seller for and against all losses, damages, claims, costs and expenses, interest, awards, judgment and penalties (including reasonable attorneys' and consultants' fees and expenses) suffered or incurred by them . . . arising out of or resulting from . . . the Excluded Liabilities . . . .

APA at 56, § 8.02; *see also* AC ¶ 7. In turn, the APA defines "Excluded Liabilities" to include "all Liabilities in respect of the claims set forth in Schedule 2.02(b)(iv)," APA at 15, § 2.02(b)(iv); *see also* AC ¶ 8, which includes "[a]ll claims and damages in, arising from, or

---

[1] The APA was actually signed by Lone Star U.S. Acquisitions, LLC rather than Continental. *See* APA at 1. However, the parties agree that Continental is the successor in interest to Lone Star U.S. Acquisitions, LLC. AC ¶ 3; Memo. in Support of MTD, Dkt. No. 26, at 5 & n.2. Therefore, the Court adopts the parties' practice of simply referring to the relevant actors as "Continental" and "Lafarge."

[2] Within the APA, Lafarge is referred to as "the US Seller" and Continental is referred to as "the Purchaser."

2

relating to a series of antitrust cases that were commenced in December of 2012 against the entire U.S. wallboard industry, including the US Seller, in several jurisdictions, including Philadelphia, Chicago and Charlotte," APA at 20, Sch. 2.02(b)(iv)(2); AC ¶ 10. The APA further details the excluded antitrust claims:

> The cases have now been consolidated in the U.S. District Court for the Eastern District of Pennsylvania. The plaintiffs generally allege that the industry has colluded to raise prices in the years 2012 and 2013. As evidence of the alleged conspiracy, plaintiffs point to a round of price announcements in the fall of 2011 (generally announcing a price rise of 25-30% and the elimination of "job costing", which provided guaranteed prices for jobs), and a second round of price increases in the fall of 2012, announcing a further price increase of 25-30%.

APA at 20, Sch. 2.02(b)(iv)(2); AC ¶¶ 10-11.

The second indemnification provision, entitled "Indemnification by the Purchaser," provides that "[f]rom and after the Closing Date, the US Seller . . . shall be indemnified and held harmless by the Purchaser . . . for and against any and all Losses, arising out of or resulting from . . . the conduct of the Business by the Purchaser following the Closing." APA at 56, § 8.03.

### C. 2015 Antitrust Actions Against Wallboard Industry ("Homebuilders Case")

In March 2015, several homebuilders commenced another antitrust case ("Homebuilders Case") against the wallboard industry alleging price-fixing activities from 2011 through 2015. AC ¶¶ 16-20; *see also* Homebuilders Second Amended Complaint ("Homebuilders Complaint"), Ex. D to AC, Dkt. No. 24-4. The Homebuilders Case named both Lafarage and Continental as defendants. AC ¶ 16; Homebuilders Complaint at 1. The Homebuilders Case was transferred to Judge Baylson by the Judicial Panel on Multidistrict Litigation because it "involve[s] questions of fact that are common to [The Purchasers Cases] previously transferred" to Judge Baylson. AC ¶ 17 (alterations in original).

The Homebuilders Complaint contains the following allegations relating to Continental:

> Starting at least as early as September 2011 and continuing through to the present day, Defendants (with Defendant Continental Building Products, Inc. affirmatively joining the conspiracy in 2013 when it acquired Defendant Lafarge North America Inc.'s gypsum business) agreed and conspired amongst themselves to raise, inflate, fix, stabilize, and/or maintain the prices at which they sold gypsum wallboard in the United States, beginning with large and coordinated price increases becoming effective on or about January 1 or 2, 2012.

Homebuilders Complaint ¶ 9.

> Defendant Continental Building Products, Inc. ("Continental") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Herndon, Virginia. Continental also maintains locations in Florida, Kentucky, and New York. Continental joined the ongoing conspiracy in 2013 when it acquired Defendant Lafarge's gypsum operations/business. Continental has manufactured and distributed gypsum wallboard to buyers in the United States since 2013.

Homebuilders Complaint ¶ 48.

> Defendants began informing customers of an additional price increase for 2014 in the early months of 2013. After Defendants had agreed on a third round of sharp price hikes but before all of the price increase announcements were sent out, two Defendants—Defendants TIN and Lafarge—sold some or all their gypsum wallboard businesses. TIN and Lafarge's active participation in the conspiracy over the preceding years permitted the conspiracy to continue to thrive. Having already built a solid foundation for continued collusive price hikes, Defendant Continental was able to easily join the conspiracy when it acquired Lafarge.

Homebuilders Complaint ¶ 212.

> On August 30, 2013, Defendant Lafarge sold its gypsum wallboard business to Defendant Continental. Similar to TIN, Lafarge did not undertake affirmative steps to disavow or to deter Defendants from continuing with the conspiracy Lafarge helped hatch and maintain. The sale by Lafarge was a business decision and did nothing to defeat the continuation of Defendants' anticompetitive scheme. Lafarge enabled the conspiracy and the conspiracy continued to benefit from Lafarge's participation after its sale.
>
> Defendant Continental, knowing the conspiracy's past illegal conduct, affirmatively joined the ongoing conspiracy in 2013 when it acquired Lafarge's gypsum wallboard business. Continental effectively stepped into the shoes of Lafarge and intended to pursue the same anticompetitive objectives as its co-conspirators. The incentives for Continental to join the cartel were high, it could

> continue to reap the benefits of the cartel with yet another artificially inflated price increase and it could do so free of consequence because it had not been named as a defendant in the already pending class action litigation.
>
> Defendants, with only slightly modified players, continued to perpetuate their anticompetitive scheme. Similar to the previous two price increases, each Defendant's increase took effect on January 1, 2014 and remained in place for all of 2014. . . . Defendant Continental announced on September 30, 2013 that "effective with orders shipped on and after Wednesday, January 1st, 2014, the price of our products will be increased by . . . 20%." In addition, Continental stated that the increased price "is intended to be in effect for all of 2014." This letter was sent from Continental's Reston, Virginia address.

Homebuilders Complaint ¶¶ 214-16 (alterations in original).

> Defendant Continental Building Products announced on October 20, 2014 that "effective with orders shipped on or after Thursday, January 1st, 2015, the price of our products will be increased by the following amount: ALL WALLBOARD PRODUCTS 20%. This price increase applies to all our gypsum board products and is intended to be in effect for all of 2015." This letter was sent from Continental's Herndon, Virginia address.
>
> Defendants continued to meet at trade association meetings and had the same opportunities to coordinate on price as in prior years.
>
> By March 2015, the price for gypsum wallboard skyrocketed as other material costs remained soft. Gypsum prices are now 5.4% higher than their 2006 housing boom peak despite an anemic housing market.

Homebuilders Complaint ¶¶ 219-221.

On April 22, 2016, the defendants in the Homebuilder Case moved to dismiss many of the claims against them. *See* Memorandum re: Defendants' Motion to Dismiss Homebuilder Plaintiffs' Claims Based on 2014 and 2015 Price Increases ("Homebuilders Order"), Ex. G to AC, Dkt. No. 24-7 (June 22, 2016), at 2; *see also* Joint Motion to Dismiss, Ex. F to AC, Dkt. No. 24-6. Judge Baylson granted the motion to dismiss with respect to all claims "based on activity after the 2013 price increase." Homebuilders Order at 2. Because all claims arising after the 2013 price increase were dismissed, Judge Baylson dismissed Continental from the Homebuilders Case. Homebuilders Order at 2, 7-8. Specifically, Judge Baylson ruled that "[b]ecause all of Plaintiffs' claims against Continental Building Products are based on activity

5

that occurred after the 2013 price increase, Continental Building Products will be dismissed from this litigation." Homebuilders Order at 8; *see also* AC ¶ 31. However, "the District Court denied Lafarge's motion to dismiss the claims asserted against it, leaving Lafarge to defend itself against the pre-2013 claims." AC ¶ 30.

### D. Present Suit

Continental incurred $1,077,235 in attorney's fees and costs in connection with its defense in the Homebuilders Case. AC ¶ 34. Continental demanded that Lafarge indemnify Continental for those legal fees. AC ¶ 35. The parties engaged in nonbinding mediation to resolve the question of indemnification without success. *See* AC ¶ 36. On April 11, 2017, Continental initiated the present action seeking (1) indemnification for its legal expenses arising from the Homebuilders Case, and (2) a declaratory judgment that Continental does not need to indemnify Lafarge for any portion of its legal fees or settlement payment from the Homebuilders Case. Complaint, Dkt. No. 1. Lafarge moved to dismiss the complaint, Dkt. No. 13, and Continental subsequently filed an amended complaint, *see* AC. Lafarge now moves to dismiss the amended complaint. MTD, Dkt. No. 25.

## II. Legal Standard

To survive a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint cannot survive a motion to dismiss "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. "In addition to the allegations in the complaint itself, a court may consider documents

attached as exhibits, incorporated by reference, or relied upon by the plaintiff in bringing suit, as well as any judicially noticeable matters." *ACE Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods.*, 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014). "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Id.* (quoting *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013)).

### III. Discussion

Lafarge moves to dismiss both claims of Continental's complaint. The Court finds that Continental has failed to state a claim upon which relief can be granted with respect to its first claim for indemnity. The Court further declines to exercise its discretionary jurisdiction over Continental's claim for declaratory relief. As a result, the motion to dismiss is granted.

#### A. Continental's Claim for Indemnity Is Dismissed

Continental argues that Lafarge is obligated to indemnify Continental for costs incurred in connection with the Homebuilders Case because that case "arose from" or is "related to" the Purchasers Cases. *See* Pl. Memo. in Opp. to MTD ("Opp."), Dkt. No. 30, at 3-4. The Court finds that the only claims brought against Continental in the Homebuilders Case alleged conduct by Continental after it had purchased Lafarge's business, and as a result, that such claims could not be "related to" Lafarge's conduct charged in the Purchasers Cases. Continental thus has failed to state a claim upon which relief can be granted.

"In the absence of a duty to indemnify imposed by law, a negligent party has no right to be indemnified unless the right is contractually-derived." *Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990). When interpreting an agreement alleged to impose a duty to indemnify, "that agreement must be strictly construed so as not to read into it any

7

obligations the parties never intended to assume." *Id.* The agreement must "demonstrate[] an 'unmistakable intent' to indemnify the negligent party." *Id.* (quoting *Kurek v. Port Chester Hous. Auth.*, 223 N.E.2d 25, 27 (N.Y. 1966)).

Under the terms of the APA, Lafarge is obligated to indemnify Continental for any losses "arising out of or resulting from . . . the Excluded Liabilities," which includes "[a]ll claims and damages in, arising from, or relating to a series of antitrust cases that were commenced in December of 2012 against the entire U.S. wallboard industry . . . . alleg[ing] that the industry has colluded to raise prices in the years 2012 and 2013." APA at 20, Sch. 2.02(b)(iv)(2) & 56, § 8.02. However, a review of the complaint in the Homebuilders Case and Judge Baylson's June 22, 2016 order makes unmistakable that the only claims made against Continental had nothing to do with the industry's alleged price-fixing in 2012 and 2013.

The Homebuilders Complaint repeatedly states that Continental's alleged involvement in the price-fixing scheme began after it purchased Lafarge's business in mid-2013. *See* Homebuilders Complaint ¶ 48 ("Continental joined the ongoing conspiracy in 2013 when it acquired Defendant Lafarge's gypsum operations/business."); Homebuilders Complaint ¶ 9 ("Defendant Continental Building Products, Inc. affirmatively join[ed] the conspiracy in 2013 when it acquired Defendant Lafarge North America Inc.'s gypsum business . . . ."). In addition, the Homebuilders Complaint alleges that Continental instituted price increases separate and apart from anything Lafarge had done with its business prior to 2013. Homebuilders Complaint ¶ 216 (alleging that Continental announced a 20% price increase for the year 2014); Homebuilders Complaint ¶ 219 (alleging that Continental announced a 20% price increase for the year 2015). Based on these allegations, the District Court concluded that the only claims alleged in the Homebuilders Case against Continental were "based on activity that occurred after the 2013

8

price increase." Homebuilders Order at 8. As a result, when Judge Baylson dismissed claims pertaining to price fixing in 2014 and 2015, he dismissed Continental from the case. Homebuilders Order at 7-8.

Based on the documents attached to the amended complaint in this action, which, as noted above, the Court must take as true if they contradict the allegations in the complaint, *ACE Sec. Corp. Home Equity Loan Tr.*, 5 F. Supp. 3d at 551, the Court concludes that the plain meaning of the indemnity provision contained in Section 8.02 of the APA does not entitle Continental to indemnification in connection with the Homebuilders Case. The only claims that Continental was forced to defend against were claims arising from Continental's *own alleged conduct* rather than claims arising from Lafarge's conduct prior to the sale of Lafarge's business. *See* Homebuilders Order at 7-8. While other defendants – including Lafarge – were forced to defend against claims arising from the same actions as were in issue in the Purchasers Cases, Continental was explicitly excluded from such claims and only alleged to be liable for its own conduct occurring after the purchase of Lafarge's business. *See, e.g.*, Homebuilders Complaint ¶¶ 9, 48, 216, 219. Such claims cannot be said to "aris[e] from, or relat[e] to" the Purchasers Cases. *See* APA at 20, Sch. 2.02(b)(iv)(2). That is so because the claims are predicated on independent actions not alleged in the Purchasers Cases, which were carried out by a separate entity who was not a defendant in the Purchasers Cases. Moreover, all of the alleged acts took place outside the timeframe at issue in the Purchasers Cases. Although the claims against Continental made by the Homebuilders plaintiffs allege the same type of conduct that other defendants were charged with in the Purchasers Cases, there is no permissible inference that the Homebuilders claims arise from or relate to the Purchasers Cases merely because both cases involve the same type of conduct. At the very least, the language of the indemnification

provision does not allow the Court to infer that the APA evidences an "unmistakable intent" to indemnify Continental under the circumstances at issue here. *Haynes*, 921 F.2d at 456.

Based on the amended complaint and the documents attached to it, there is no possibility that the indemnification provision in the APA could entitle Continental to indemnification for defending itself in the Homebuilders Case. Because Continental has failed to state a claim upon which relief could be granted, the motion to dismiss is granted as to its first claim.

### B. Continental's Claim for Declaratory Judgment Is Dismissed

Continental's second claim seeks declaratory judgment that Continental is not obligated under Section 8.03 of the APA to indemnify Lafarge for any of Lafarge's attorney's fees, costs, or settlement payment in connection with the Homebuilders Case. AC ¶¶ 40-48. For the reasons stated below, the Court declines to exercise its discretion to entertain the request for declaratory judgment.

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy." An "actual controversy" exists if there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cos. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The controversy between the parties must "have taken on fixed and final shape so that a court can see what legal issues it is deciding." *Jenkins v. United States*, 386 F.3d 415, 418 (2d Cir. 2004) (quoting *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952)). "Even where an actual controversy has been established, a court must still decide whether it will exercise its discretion to entertain a request for declaratory judgment." *Amusement Indus., Inc. v. Stern*, 693

F.Supp.2d 301, 311 (S.D.N.Y. 2010). The Declaratory Judgment Act "confers a discretion on the courts rather than an absolute right upon the litigant." *Wycoff Co.*, 344 U.S. at 241.

In deciding whether to exercise its permissive jurisdiction, a district court may consider "equitable, prudential, and policy arguments," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007), and should examine the situation in its entirety, *Great Am. Ins. Co. v. Houston General Ins. Co.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990). A court should specifically consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Amusement Indus., Inc.*, 693 F.Supp.2d at 311 (quoting *Duane Reade, Inc.*, 411 F.3d at 389). A court may also consider:

> (1) whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy.

*Amusement Indus., Inc.*, 693 F. Supp. 2d at 311 (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003)). "When [a] traditional remedy provides the parties with the procedural safeguards required by the law to insure the availability of a proper remedy, the courts, in exercising their discretion, may properly dismiss the declaratory judgment action." *John Wiley & Sons, Inc. v. Visuals Unlimited, Inc.*, No. 11–cv–5453 (CM), 2011 WL 5245192, at *4 (S.D.N.Y. Nov. 2, 2011) (quoting *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1169 (7th Cir. 1969)).

The Court concludes that it should not exercise permissive jurisdiction in this case. It is not clear that the legal controversy has "taken on a fixed and final shape." *See Jenkins*, 386 F.3d at 418. Lafarge argues that it has not "pursue[d] its indemnification claim" and intimates that it

11

may choose not to do so. *See* Support at 14 n.5. As a result, there is certainly a "better or more effective remedy" to resolve this action. *See Amusement Indus., Inc.*, 693 F. Supp. 2d at 311. Specifically, if Lafarge chooses to seek indemnification, it may file a complaint alleging breach of contract. This will ensure that the judicial system does not unnecessarily devote resources to resolving a controversy that does not actually exist. Moreover, this will provide the parties with an opportunity to adequately brief the legal and factual issues surrounding Section 8.03 and the claims in the Homebuilders Case related to Lafarge. The issue of indemnification under Section 8.03 can be resolved through direct litigation if Lafarge determines that it has a legitimate basis for seeking such.

As a result, the Court declines to exercise its discretionary declaratory judgment jurisdiction in this case. The motion to dismiss is granted on the second claim.

**IV.     Conclusion**

The motion to dismiss is granted. This resolves Docket Number 25. The Clerk of Court is directed to close the case and enter judgment.

SO ORDERED.

Dated: March 27, 2018
       New York, New York

_____
ALISON J. NATHAN
United States District Judge